**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| PHILLIP S. STENGER, not in his | : | |
| individual capacity but as the court- | : | |
| appointed receiver for the assets of | : | CIVIL ACTION NO. |
| Charles Richard Homa, Michael | : | 1:04-CV-00151-RWS |
| Gause, D. Dean Pearson, and | : | |
| various related entities, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WORLD HARVEST CHURCH, | : | |
| INC., a Georgia non-profit | : | |
| corporation, | : | |
| | : | |
| Defendant. | : | |

**<u>ORDER</u>**

This action comes before the Court on cross-motions for summary

judgment [67, 78], Defendant's Motion to Strike and Objection to Affidavits

[82], and Defendant's Motion for Leave to File Third-Party Complaint [110].[1]

---

[1] Defendant's Motion for Leave to File Third-Party Complaint [110] appears twice on the docket. The Clerk is **DIRECTED** to remove the second entry [111] from the

The Court has reviewed the record, and now enters the following Order.

## Background

**I.     The History of the Cash 4 Titles "Alleged"[2] Ponzi Scheme**

This action arises out of what has come to be known as an elaborate

Ponzi scheme[3] overseen by Charles Richard Homa, Michael E. Gause, and D.

---

pending motions list.

[2] Defendant has denied, often with little, if any, countervailing evidentiary support, most of the statements in Plaintiff's Statement of Undisputed Material Facts.  Indeed, many of their responses to Plaintiff's Statement read more like hyper-technical discovery objections than the good-faith admissions or denials contemplated by the local rules.   In any event, due to the myriad denials, even respecting the basic factual history leading up to this suit, the Court here does not purport to set forth only those facts the parties agree are "undisputed," but simply lays out Plaintiff's allegations to assist the reader in understanding this controversy's storied background.   Plainly, the Court makes no "findings" in this Order, and nothing in this Background should be read as indicating the finding of any fact.  The Court takes up in its Discussion those purported factual disputes that either one or both of the parties contend are genuine and material to the resolution of their cross-motions for summary judgment.

[3]A Ponzi scheme, see In re Ponzi, 15 F.2d 113 (D. Mass. 1926), is

>           a pyramid-type investment scheme where investors are paid
>           profits from newly attracted investors promised large returns
>           on their principal investments.   Typically it is not supported
>           by any underlying business venture.    An investor that does
>           receive  money  is  not  receiving  income  on  his  or  her
>           investment, but merely a return of his or her own principal, or
>           that  of  another  investor.    More  and  more  investors  are
>           solicited  in  order  that  the  investors  at  the  top  of  the  pyramid
>           can  be  compensated.    Usually  the  pyramid  collapses,  the
>           majority  of  investors  never  receive  any  profits,  losing  their

Dean Pearson (the "Receivership Subjects"). These individuals are alleged to have induced others to invest hundreds of millions of dollars in an enterprise known as Cash 4 Titles ("C4T"), which purported to provide capital to consumer lending companies. In reality, Plaintiff alleges, the contributions of newer investors were used to pay "profits" to older investors, and were appropriated and used by the Receivership Subjects for their own purposes.

According to Plaintiff, in October of 1999, the Securities and Exchange Commission (the "SEC") filed suit against Mr. Homa, Mr. Gause, and Mr. Pearson, as well as various related entities, in the United States District Court for the Northern District of Illinois in connection with their participation in the C4T scheme. Ultimately, the SEC action concluded with the defendants consenting to pay civil disgorgement. Mr. Gause, in particular, agreed to make disgorgement in the amount of $193,242,353.80. In three orders entered between November of 1999 and September of 2000, moreover, the Illinois Court appointed Plaintiff as a receiver to marshal and conserve the assets of Mr. Homa, Mr. Gause, and Mr. Pearson, as well as various entities affiliated with

principal investment as well.

In re Fin. Federated Title & Trust, Inc., 309 F.3d 1325, 1327 n.2 (11th Cir. 2002).

3

these individuals and the C4T enterprise (including, among others, Sunset

Financial Services, LLC, C4T Management, Inc., T/P Funding Services, Inc.,

"and affiliated entities of the foregoing," referred to herein collectively as the

"C4T Entities").  See Pl.'s Mot. for Summ. J. at Ex. A ¶ 1, Exs. B-C; see also

SEC v. Homa, No. 99 C 6895, 2004 WL 1093492, at *1 (N.D. Ill. May 13,

2004) ("On November 2, 1999, Mr. Phil Stenger was appointed receiver of the

assets of Homa, Sunset Financial Services, LLC, C4T Management, Inc., T/P

Funding Services, Inc. and the affiliated entities of the foregoing . . . .  The

Receiver's general mandate is to marshal C4T related assets for the benefit of

investors.").

In early 2001, Mr. Gause pled guilty to securities fraud before the United

States District Court for the Southern District of New York in connection with

his involvement in the C4T enterprise, and is presently serving time in prison.

Mr. Homa pled guilty to similar charges, but has now completed his prison

term.

## II.    Defendant World Harvest Church

A substantial portion of the funds allegedly generated by the C4T Ponzi

scheme are alleged to have found their way into the hands of Defendant World

4

Harvest Church.  Mr. Gause, in particular,[4] is alleged to have given, or caused,

through various affiliated entities (including, *e.g.*, the Gause Foundation,

Offshore Title Investments, JC Ministries, and Unique Projects, referred to

herein collectively as the "Gause Affiliated Entities"), to be given,

$1,808,400.00[5] to Defendant.  (<u>See</u>  Pl.'s Mot. for Summ. J. [67] at Ex. AA ¶¶

19-22 [hereinafter "Second Kahlberg Aff."].)

Plaintiff initiated suit against Defendant for fraudulent conveyance and

unjust enrichment in the United States District Court for the Northern District of

Illinois.  <u>See</u> <u>Stenger v. World Harvest Church</u>, Case No. 02 C 8036 (N.D. Ill.

filed Nov. 6, 2002).  That suit was dismissed for lack of personal jurisdiction,

however, by an order of the Illinois Court dated August 29, 2003.  <u>See</u> <u>Stenger</u>

<u>v. World Harvest Church</u>, Case No. 02 C 8036, 2003 WL 22048047 (N.D. Ill.

Aug. 29, 2003).  Within six months of that dismissal, on January 21, 2004,

---

[4] In his Complaint, Plaintiff challenges not just the donations made to Defendant by Mr. Gause and the Gause Affiliated Entities, but also those made by Mr. Pearson and his wife, who are alleged to have fraudulently conveyed approximately $70,000 to Defendant. The Motion for Summary Judgment, however, only appears to seek relief *vis-a-vis* the substantially larger sums contributed by Mr. Gause and affiliated entities.

[5] Defendant's pastor, Mirek Hufton, submitted an affidavit enumerating contributions by Mr. Gause and affiliated entities that, when totaled by the Court, amount to $1,774,826.00. It has not raised the discrepancy in its papers, however, and has offered no evidence rebutting Mr. Kahlberg's $1,808,400.00 figure.

Plaintiff initiated the instant action asserting like claims. Both parties have now

moved for summary judgment. Defendant has additionally moved to strike

certain affidavits Plaintiff offered in support of his motion for summary

judgment and for leave to file a third-party complaint against its insurance

company.

### Discussion

The Court begins by considering the parties' cross-motions for summary

judgment. It then turns to Defendant's Motion to Strike and Objection to

Affidavits [82] and Motion for Leave to File Third-Party Complaint [110].

### I.    Cross-Motions for Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party bears

'the initial responsibility of informing the . . . court of the basis for its motion,

and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which

AO 72A
(Rev.8/82)

it believes demonstrate the absence of a genuine issue of material fact.' "

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004)

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986) (internal quotations omitted)).  Where the moving party

makes such a showing, the burden shifts to the non-movant, who must go

beyond the pleadings and present affirmative evidence to show that a genuine

issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The applicable substantive

law identifies which facts are material.  Id. at 248.  A fact is not material if a

dispute over that fact will not affect the outcome of the suit under the governing

law.  Id.  An issue is genuine when the evidence is such that a reasonable jury

could return a verdict for the non-moving party.  Id. at 249-50.

    In resolving a motion for summary judgment, the court must view all

evidence and draw all reasonable inferences in the light most favorable to the

non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th

Cir. 2002).  But, the court is bound only to draw those inferences which are

reasonable.  "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial."  Allen

7

v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89

L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477

U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586

(once the moving party has met its burden under Rule 56(c), the nonmoving

party "must do more than simply show there is some metaphysical doubt as to

the material facts.").

     Finally, the filing of cross-motions for summary judgment does not give

rise to any presumption that no genuine issues of material fact exist.  Rather,

"[c]ross-motions must be considered separately, as each movant bears the

burden of establishing that no genuine issue of material fact exists and that it is

entitled to judgment as a matter of law."  Shaw Constructors v. ICF Kaiser

Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

     **A.   Unjust Enrichment Claim**

     Although hardly the predominant focus of the parties' papers, the Court

begins by addressing Plaintiff's claim for unjust enrichment.  In the broadest

sense, "[t]he theory of unjust enrichment[,]" under Georgia law, "is basically an

8

equitable doctrine that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay." Morris v. Britt, 620 S.E.2d 422, 424 (Ga. Ct. App. 2005) (quoting Hollifield v. Monte Vista Biblical Gardens, Inc., 553 S.E.2d 662, 669 (Ga. Ct. App. 2001)). To apply, however, "the party conferring the labor and things of value must act with the expectation that the other will be responsible for the cost." Id. That is, "[e]ven where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, *as between the two persons*, it is unjust for him to retain it." Stoker v. Bellemeade, LLC, 615 S.E.2d 1, 5 (Ga. Ct. App. 2005) (emphasis supplied).

The facts of this case, simply stated, do not fit neatly into the unjust enrichment theory. Defendant took the proffered sums from Gause and related entities as tithes or gifts. There is no evidence that Gause or the conferring entities acted with any expectation that Defendant assumed or would bear some correlative obligation in accepting the monies. Cf. Morris, 620 S.E.2d at 424; Hollifield, 553 S.E.2d at 670. And, evaluated only "as between" Gause and the Gause Affiliated Entities on the one hand, and Defendant on the other, the Court would have great difficulty finding that Defendant's retention of the gifts would

9

be unjust.  Cf. Stoker, 615 S.E.2d at 5.  Rather, the injustice that flows from

Defendant's retention of the funds in this case arises, if at all, due to the fact that

the funds were conveyed to Defendant fraudulently–either as gifts when the

transferor was insolvent, or in an effort to defraud creditors when Defendant

was on notice of that intention.  See O.C.G.A. § 18-2-22(2) & (3) (repealed

2002).  Suit for fraudulent conveyance, rather than for unjust enrichment, is the

proper vehicle to seek redress for such an evil.  Accordingly, insofar as

Defendant seeks summary judgment on this claim, its motion will be granted.

Plaintiff's motion, to the extent it seeks judgment in his favor, will be denied.

**B.    Fraudulent Conveyance**

Plaintiff claims that the transfers made to Defendant by Mr. Gause and the

Gause Affiliated Entities were fraudulent within the meaning of Georgia's now

repealed fraudulent conveyance statute, O.C.G.A. § 18-2-22 (repealed 2002).

That statute, in force at the time the challenged conveyances were made,

provided:

> The following acts by debtors shall be fraudulent in

10

law against creditors and others[6] and as to them shall
be null and void:

. . .

(2) Every conveyance of real or personal estate, by
writing or otherwise, and every bond, suit, judgment
and execution, or contract of any description had or
made with intention to delay or defraud creditors,
where such intention is known to the taking party; a
bona fide transaction on a valuable consideration,
where the taking party is without notice or ground for
reasonable suspicion of said intent of the debtor, shall
be valid; and

(3) Every voluntary deed or conveyance, not for a
valuable consideration, made by a debtor who is
insolvent at the time of the conveyance.

O.C.G.A. § 18-2-22 (repealed 2002).  Defendant contends that the claims fail,

not only for want of admissible evidentiary support, but because they are

untimely and because the fraudulent conveyance statute, as applied to a church,

violates the Free Exercise Clause of the First Amendment, made applicable to

the states by the Fourteenth Amendment.

---

[6] The "and others" language, in the view of this Court, precludes any argument that
suit under O.C.G.A. § 18-2-22 may be brought only by "creditors," and instead opens up the
possibility for claims by litigants such as Plaintiff.  See also Stenger v. Rogers, No. 1:03-
CV-1292-JEC, 2006 WL 449151, at *7-*12 (N.D. Ga. Feb. 22, 2006) (entertaining claim
brought by Plaintiff against recipients of transfers from Mr. Homa under O.C.G.A. § 18-2-
22).

The Court addresses the merits of the parties' respective contentions below.  Before doing so, however, it takes the opportunity to clarify the theory that underlies a receiver's suit for fraudulent conveyance *vis-a-vis* a collapsed Ponzi scheme.  An appreciation of that theory is necessary for the principled resolution of the parties' claims and defenses.

1.    <u>The Nature of a Receiver Suit to Recover Funds<br>Fraudulently Conveyed in a Ponzi Scheme</u>

A review of the parties' papers reveals an underlying disagreement, and, perhaps, an understandable confusion, about the nature of a suit by a receiver, such as Plaintiff, to recover funds conveyed by participants engaged in an unlawful enterprise.  For its part, Defendant acknowledges the "settled [rule] that an equity receiver has the power to bring ancillary actions to recover assets which were fraudulently transferred to investors in a Ponzi scheme."  <u>Obermaier v. Arnett</u>, No. 2:02CV111FTM29DNF, 2002 WL 31654535, at *3 (M.D. Fla. Nov. 20, 2002) (citing <u>Commodity Futures Trading Comm'n v. Am. Commodity Group Corp.</u>, 753 F.2d 862, 866 n.6 (11th Cir.1984); <u>Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.</u>, 713 F.2d 1477 (10th Cir. 1983)).  It nevertheless contends that the claims at issue here are, in

12

reality, being asserted on behalf of the C4T investors, not any entity in receivership, and that Plaintiff consequently lacks standing to pursue them. Plaintiff counters that the order appointing him as a receiver gave him dominion over the property of Mr. Gause, including his interests in the Gause Affiliated Entities that transferred funds to Defendant, and that such control over the "Receivership Property" confers standing to prosecute the instant claims. In the view of the Court, both parties' arguments reflect a certain misapprehension regarding the theory that underlies a receiver's ability to recover funds that originated from the illegal operations of a collapsed Ponzi scheme.

The seminal case in this area of the law is Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995). The Scholes action involved a Ponzi scheme operated by Michael Douglas, who, through several corporations and partnerships, falsely represented to prospective investors that, were they to invest in the enterprise, their funds would be used to purchase and trade commodities, and that they would enjoy an extraordinary rate of return. See 56 F.3d at 752. Instead, as is characteristic of a Ponzi scheme, most of the investor's funds went to pay the unachievable returns Douglas had promised on the investment, and, to the extent not so directed, were misappropriated for Douglas's own ends. Eventually, the

AO 72A
(Rev.8/82)

scheme collapsed, Douglas pled guilty to fraud, and a receiver was appointed to collect the assets of Douglas and the entities involved in the Ponzi scheme for the benefit of the defrauded investors.  The <u>Scholes</u> action itself arose out of the receiver's efforts to recover assets from Douglas's ex-wife, from one profitable investor, and from several religious groups, to whom Douglas and the entities in receivership had transferred investor funds.

In rejecting an argument by the defendants that the receiver was in no position to bring claims on behalf of the investors, the Seventh Circuit acknowledged that "a receiver does not have standing to sue on behalf of the creditors of the entity in receivership[,]" but rather, "may sue only to redress injuries *to* the entity in receivership[.]"  <u>Id.</u> at 753 (emphasis supplied).  The Court went on to explain, however, that the principle did not undercut the viability of the claims before it.  The entities at issue, "no more Douglas's evil zombies[,]" were *themselves* entitled to recover those funds Douglas had caused them to waste.  <u>Id.</u> at 754.  Judge Posner, writing for the panel, reasoned:

> The corporations, Douglas's robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties.  They received money from unsuspecting, if perhaps greedy and foolish, investors.  That money should have been used for the

stated purpose of the corporations' sale of interests in the [investment vehicles], which was to trade commodities.  Instead Douglas caused the corporations to pay out the money they received to himself, his ex-wife, his favorite charities, and an investor . . . .  In the case of the ex-wife, the money went from the corporations first to Douglas and then from him to her, but we cannot see what difference that should make . . . .

The three sets of transfers removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations.  As sole shareholder, Douglas could lawfully have ratified the diversion of corporate assets to noncorporate purposes-but only if creditors were not harmed. [Cit.] Creditors were harmed . . . .  "It was not within the power of the shareholders to legalize this waste to the detriment of others."  [Cit.]

Though injured by Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud.  The rule is that the maker of the fraudulent conveyance and all those in privity with him-which certainly includes the corporations-are bound by it.  [Cit.]  But the reason, of course, as the cases just cited make clear, is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors.  That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations.  The appointment of the receiver removed the wrongdoer

15

> from the scene . . . .  Freed from [Douglas's] spell the
> [corporations] became entitled to the return of the
> moneys–for the benefit not of Douglas but of innocent
> investors–that Douglas had made the corporations
> divert to unauthorized purposes.

Id. at 753-54.  Similar reasoning has found favor in other jurisdictions, including

within this Circuit.  See, e.g., Obermaier, 2002 WL 31654535, at *3 (collecting

cases).

As the Court evaluates the viability of Plaintiff's fraudulent conveyance

claim, then, it does so with the understanding that Plaintiff brings suit, not as an

individual or as a representative of the defrauded investors in the C4T scheme,

but rather, "standing in the shoes," so to speak, of those persons and entities in

receivership–the Receivership Subjects and, more importantly, the C4T Entities.

It is from that vantage point that the Court must evaluate the claims and defenses

presented in this case.

2.    Statute of Limitations Defense

The limitations period applicable to Plaintiff's claims under O.C.G.A. §

18-2-22, the parties agree, is four years from the date the action accrued.  See In

re Dulock, 282 B.R. 54, 59 (Bankr. N.D. Ga. 2002) (citing O.C.G.A. § 9-3-32).

Defendant argues that, because this suit was not initiated until January 2004, and

because the last challenged transfer took place in 1999, Plaintiff's claims are time-barred. Plaintiff responds by arguing that this is a renewal action within the meaning of O.C.G.A. § 9-2-61(a), and thus, is deemed to have been filed on November 6, 2002–the date suit was initially brought against Defendant in the United States District Court for the Northern District of Illinois. He further contends that, in any event, the claims here did not "accrue" until after he was appointed as receiver, and *he* discovered, or reasonably should have discovered, the existence of the allegedly fraudulent transfers. Due to the complexity of the account structures employed by Mr. Gause and the C4T Entities, he states that he could not have, and in fact, did not uncover these transfers until late 2000, and that the instant suit is therefore timely.

The Court begins by evaluating Plaintiff's position that this is a renewal action within the meaning of O.C.G.A. § 9-2-61(a). It then turns to consider on what date the instant action can fairly be understood to have accrued. Ultimately, it finds that Plaintiff's claims are timely asserted.

a.      This action was properly renewed

In Georgia,

When any case has been commenced in either a state

> or federal court within the applicable statute of
> limitations and the plaintiff discontinues or dismisses
> the same, it may be recommenced in a court of this
> state or in a federal court either within the original
> applicable period of limitations or within six months
> after the discontinuance or dismissal, whichever is
> later . . . .

O.C.G.A. § 9-2-61(a).  "A properly filed renewal action stands on the same

footing as the original action with respect to statutes of limitation.  [Cit.]

Accordingly, if a renewal action is properly filed within six months after

dismissal of the original action, it remains viable even though the statute of

limitation may have expired."  Blackwell v. Goodwin, 513 S.E.2d 542, 544 (Ga.

Ct. App. 1999).

Here, Defendant claims that Plaintiff cannot avail himself of the renewal

statute, and thus, cannot claim a November 6, 2002 filing date, because the

original suit was "void."  See Hobbs v. Arthur, 444 S.E.2d 322, 323 (Ga. 1994)

(renewal statute does not apply to void cases).  It cites two bases for this

proposition.  First, Defendant claims that service of process was never

perfected in the Illinois action.  See id. ("The original suit is void if service was

never perfected, since the filing of a complaint without perfecting service does

not constitute a pending suit.").  Second, it argues that renewal is not available

18

because the Illinois action was dismissed by the court, not the Plaintiff.  See id.

("A suit is also void and incapable or renewal under O.C.G.A. § 9-2-61(a) if

there has been a judicial determination that dismissal is authorized.").  The Court

finds neither argument persuasive.

As to the first cited ground, lack of service, the record makes clear that

service *was* personally effected on Defendant's registered agent on December

16, 2002.  (See Pl.'s Resp. to Def.'s Mot. for Summ. J. [103] at Ex. F.)  There

is no basis in the record for concluding that such service was imperfect under

Federal Rule of Civil Procedure 4(h).  See FED. R. CIV. P. 4(h)(1) ("Unless

otherwise provided by federal law, service upon a domestic or foreign

corporation . . . shall be effected . . . by delivering a copy of the summons and

of the complaint to an officer, a managing or general agent, or to any other agent

authorized by appointment or by law to receive service of process . . . .").

Defendant's reliance on the Illinois District Court's Order to argue otherwise,

moreover, is misplaced.  See Stenger v. World Harvest Church, Inc., No. 02 C

8036, 2003 WL 22048047 (N.D. Ill. Aug. 29, 2003).  While that decision held

that service was insufficient to establish personal jurisdiction over Defendant

under Rule 4(k), see FED. R. CIV. P. 4(k) (providing that "[s]ervice of a

summons . . . is effective to establish jurisdiction over the person of a defendant

. . . when authorized by a statute of the United States"), it did not go so far as to

hold that the underlying service of process on Defendant was itself entirely

ineffectual.  See id.  The fact that such service was insufficient to vest the

Illinois Court with jurisdiction over Defendant is of no consequence to the

renewal analysis.  See, e.g., Hudson v. Mehaffey, 521 S.E.2d 838, 839 (Ga. Ct.

App. 1999) ("To constitute a 'valid action,' the complaint must be served

personally on the defendant."); see also Chance v. Planters Rural Tele.

Cooperative, Inc., 131 S.E.2d 541, 544 (Ga. 1963) (stating that renewal is

available where original suit was dismissed for lack of personal jurisdiction over

defendant); Weddington v. Kumar, 256 S.E.2d 141, 142 (Ga. Ct. App. 1979)

(same).

  Likewise, the fact that the Illinois action was dismissed by the court,

rather than by Plaintiff on his own motion, does not foreclose the possibility of

renewal.  While the language of the statute itself, admittedly, might suggest a

contrary result, the Georgia courts have long held that involuntarily dismissal,

other than on the merits, poses no bar to the invocation of O.C.G.A. § 9-2-

61(a).  See Hobbs, 444 S.E.2d at 323 ("The renewal statute is remedial in

nature; it is construed liberally to allow renewal where a suit is disposed of on any ground not affecting its merits."); <u>Chance</u>, 131 S.E.2d at 544 (" 'Where the plaintiff begins an action in a court of this state having jurisdiction of the subject-matter, and, after the bar of the statute has attached, the same is dismissed because of a ruling indicating that the court has no jurisdiction of the person, such action may be renewed within six months in another court of this state having jurisdiction of the person and the subject[-]matter.' ") (quoting <u>Atlanta, K. & N. Ry. Co. v. Wilson</u>, 47 S.E. 366 (Ga. 1904)); <u>Kimball v. KGB Transp.</u>, 527 S.E.2d 233, 234 (Ga. Ct. App. 1999) ("Although the statute states that it applies where a plaintiff has dismissed an action, we have held that it applies to voluntary or involuntary dismissals where the merits were not adjudicated."); <u>Owens v. Hewell</u>, 474 S.E.2d 740, 741 (Ga. Ct. App. 1996) ("O.C.G.A. § 9-2-61 applies to involuntary, as well as voluntary dismissals, where the merits of the case are not adjudicated."); <u>Brooks v. Douglas</u>, 267 S.E.2d 495, 497 (Ga. Ct. App. 1980) (holding likewise); <u>accord</u> <u>Lau v. Klinger</u>, 46 F. Supp. 2d 1377, 1383 (S.D. Ga. 1999) ("Because the legislature intended this statute as 'remedial,' courts have liberally construed it to apply also in cases where the court rather than the plaintiff dismisses the case when the merits are

21

not adjudicated . . . .").  But cf. Oduok v. Phillips, 154 Fed. Appx. 878, 881

(11th Cir. 2005) ("[B]y its plain terms, the Georgia renewal statute does not

apply because the federal claims in Oduok's 2000 action were dismissed on the

merits *by the district court*, not Oduok as O.C.G.A. § 9-2-61(a) requires.")

(emphasis in original).

Simply stated, this action was properly "renewed" within the  meaning of

O.C.G.A. § 9-2-61(a).  Pursuant to the Georgia Code, it is to be treated, for

statute of limitations purposes, as if suit had been filed on November 6, 2002.

      b.     Claims did not accrue until appointment of Plaintiff as receiver

The next task for the Court in evaluating whether this action was timely

filed is to determine when Plaintiff's claims accrued.  Because the applicable

statute of limitations is four years from the date of accrual, see In re Dulock, 282

B.R. at 59 (citing O.C.G.A. § 9-3-32), the claims must have accrued no earlier

than November of 1998 to be timely.

According to Defendant, even if this lawsuit is treated as a renewal action,

only claims challenging the transfers made during 1999 are tenable.  Suit

attacking the contributions made between 1994 and 1998, it argues, are beyond the reach of this Court.  The Court disagrees.

The statute of limitations applicable to Plaintiff's claims for fraudulent conveyance did not commence until the fraudulent transfers were or should reasonably have been discovered.  See Jones v. Spindel, 235 S.E.2d 486, 487 (Ga. 1977); cf. also Denham v. Shellman Grain Elevator, Inc., 181 S.E.2d 894, 896-97 (Ga. Ct. App. 1971) (holding likewise).

To be sure, the focus in applying the discovery rule in this case is on the C4T Entities in receivership, whose funds were allegedly misappropriated by Mr. Gause and the Gause Affiliated Entities for impermissible ends.  See, e.g., Wuliger v. Christie, 310 F. Supp. 2d 897, 908 (N.D. Ohio 2004) (applying principle that " '[a] receiver stands in the shoes of the person for whom he has been appointed and can assert only those claims which that person could have asserted' " to determine timeliness of action) (quoting Armstrong v. McAlpin, 699 F.2d 79, 89 (2d Cir. 1983)).  And, typically, the knowledge of Mr. Gause of his allegedly illegitimate transfers could be imputed to the entities for purposes of ascertaining the date of actual or reasonable "discovery."  See, e.g., Stein Steel & Supply Co. v. Franco, 251 S.E.2d 74, 75 (Ga. Ct. App. 1978)

23

("knowledge of officers of a corporation is knowledge to that corporation and the corporation is bound thereby").

Nevertheless, here, the fact that Mr. Gause was acting to achieve his own purposes, adverse to the interests of these entities, precludes such imputation during the tenure of his (and his co-conspirators') dominion over them.  See, e.g., Am. Standard Credit, Inc. v. Nat'l Cement Co., 643 F.2d 248, 271 (5th Cir. April 20, 1981) (describing adverse interest exception to the rule of imputation as "well established");[7] In re Plaza Mortgage & Fin. Corp., 187 B.R. 37, 45 n.6 (Bankr. N.D. Ga. 1995) ("The adverse interest exception is an exception to the general rule that a corporation is charged with constructive knowledge of all material facts of which its officers or agents acquire knowledge.  Where an officer or agent is engaged in a scheme to defraud a corporation, the presumption that knowledge held by the agent was disclosed to the [corporation] fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose.") (internal quotations omitted); Peoples Bank of Glennville v. Burkhalter, 177 S.E. 708 (Ga. 1934)

_____

[7] The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

("The cashier of a bank is generally the active hand in the conduct of its
business as a bank; and knowledge of the cashier is imputed to the bank, except
where he is acting in a dual capacity and his individual interest is adverse to the
interest of the bank.").  Rather, the C4T Entities are not charged with discovery
of Mr. Gause's unlawful transfers until such time as he and his co-conspirators
were ousted from control, and Plaintiff was appointed as receiver, or,
conceivably, at some time after that appointment when Plaintiff's review of the
entities' records should have alerted him to these acts of malfeasance.  See Hunt
v. Am. Bank & Trust Co. of Baton Rouge, 783 F.2d 1011, 1013 (11th Cir.
1986), aff'g 606 F. Supp. 1348, 1354-59 (N.D. Ala. 1985) (so holding)
(applying Florida law); In re Blackburn, 209 B.R. 4, 9-13 (Bankr. M.D. Fla.
1997) (holding likewise).

In the instant case, Plaintiff was appointed as receiver for the C4T Entities
on November 2, 1999.  (See Pl.'s Mot. for Summ. J. [67] at Ex. A.)  Because
this action was initiated, for purposes of the statute of limitations inquiry, on
November 6, 2002–comfortably within the applicable four year limitations
period–his claims are timely.  Insofar as Defendant seeks summary judgment on
the basis of its statute of limitations defense, its motion will be denied.

25

3.   First Amendment Challenge

Before turning to the merits of Plaintiff's fraudulent conveyance claim, the Court considers, briefly, Defendant's contention that the statute giving rise to that cause of action (at least insofar as it applies to transfers made by an insolvent party without valuable consideration) offends the Free Exercise Clause of the United States Constitution.  It is Defendant's position that the law is not "generally applicable" within the meaning of Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993), in that it has a disproportionate impact on churches, which receive the bulk of their funding from tithes and offerings.

This argument is neither novel nor persuasive.  The statute at issue draws no distinction between religious and non-religious bodies, and Defendant has pointed to nothing in its legislative history or application to indicate an even masked hostility to religious institutions.  Cf., e.g., In re Newman, 203 B.R. 468, 474-75 (N.D. Kan. 1996) (upholding 11 U.S.C. § 548(a)(2) against similar attack).  To the extent that, as Defendant argues, application of the fraudulent conveyance statute to "wholly innocent religious organizations" reflects a poor

26

policy decision, that is a matter better left for resolution by the Georgia

legislature than by this Court.  Scholes, 56 F.3d at 761.

4.      Merits of Fraudulent Conveyance Claim

Having rejected Defendant's First Amendment and statute of limitations

challenges, the Court must address the merits of Plaintiff's fraudulent

conveyance claims.  For the reasons that follow, it concludes that Plaintiff is

entitled, as a matter of law, to judgment in his favor under O.C.G.A. § 18-2-

22(3), which deems fraudulent "[e]very voluntary deed or conveyance, not for a

valuable consideration, made by a debtor who is insolvent at the time of the

conveyance."[8]

a.      The C4T Entities were insolvent

First, a review of the record establishes that the C4T Entities, at the time

Mr. Gause and the affiliated entities appropriated and transferred funds to

Defendant, were insolvent.  "By definition, an enterprise engaged in a Ponzi

scheme is insolvent from day one."  In re Indep. Clearing House Co., 77 B.R.

843, 871 (Bankr. N.D. Utah 1987); accord In re Ramirez Rodriguez, 209 B.R.

---

[8] Because it finds the conveyances fraudulent under subsection (3) of the statute,
the Court need not consider whether the transfers would also be actionable under
subsection (2).

424, 430-31 (S.D. Tex. 1997) ("The promised rate of return renders a Ponzi

scheme operator insolvent from the scheme's inception, because the returns

exceed any legitimate investments."); <u>Stenger</u>, 2006 WL 449151, at *7 ("a

Ponzi scheme is insolvent from day one"); <u>see also</u> <u>In re Fin. Federated Title &</u>

<u>Trust</u>, 309 F.3d 1325, 1332 (11th Cir. 2002) (acknowledging principle).

Defendant, for its part, does not take issue with this principle, but instead

argues, first, that the materials in the record fail to establish that the C4T Entities

were engaged in a Ponzi scheme, and, second, that there has been no showing

that Mr. Gause and the Gause Affiliated Entities were themselves insolvent at the

time the challenged transfers were made.  The Court addresses each argument

below.

(i)      <u>The record supports the C4T Entities'</u><br><u>insolvency</u>

As an initial matter, the record in this case is ripe with evidence

demonstrating that the C4T Entities were embroiled in an elaborate Ponzi

scheme.  Without going through the entirety of Plaintiff's evidence in this

regard, the Court observes that, if nothing else, the affidavit of H. Jonathan

Kahlberg, Plaintiff's forensic accounting expert, and the guilty plea of Mr.

28

Gause, are sufficient to establish that the C4T Entities operated as such a scheme, and were necessarily insolvent.

(a)    <u>The Kahlberg Affidavit</u>

Mr. Kahlberg is a forensic accountant employed by Ernst & Young (London) LLP with several years of forensic accounting experience.  (<u>See</u> Pl.'s Mot. for Summ. J. [67], Ex. AA, at Ex. 1 ¶¶ 3, 6 [hereinafter "First Kahlberg Aff."].)  He was retained by Plaintiff in 2000 to provide forensic accounting services in this and related cases.  (<u>Id.</u> at ¶ 6.)  Mr. Kahlberg has testified that, in that capacity, he "reviewed the financial records of Cash 4 Titles related companies and its affiliated marketers, including but not limited to, bank statements and accounting records, located in the United States, Cayman Islands and the Commonwealth of Dominica, as well as other jurisdictions[.]" (<u>Id.</u> at ¶ 15.)  He also claims to have reviewed databases "populated with bank transaction details for the accounts relating to the C4T Scheme in the US . . . and in the Cayman Islands . . . ."  (<u>Id.</u> at ¶¶ 16-18.)  Critically, Mr. Kahlberg testifies that, based on his review of "[t]he admissions of Gause and Homa that Cash 4 Titles was a Ponzi Scheme[,]" his "review of the Cash 4 Titles records in the Cayman Islands [which] identified new investor money [that] was used to

29

pay returns to old investors[,] and . . . [a] comparison of the interest paid to

investors from Cash 4 Titles as compared to the combined net income earned

by all the Cash 4 Titles stores[,]" "[i]t is [his] conclusion that new investor

money was used to pay returns to old investors in the Cash 4 Titles scheme and

was therefore a Ponzi Scheme."  (Id. at ¶ 76.).

Affidavits such as this have routinely been admitted to demonstrate that

an enterprise operated as a Ponzi scheme and was consequently insolvent.  See,

e.g., In re Lake Country Invs., 255 B.R. 588, 595-96 (Bankr. N.D. Idaho 2000)

(expert affidavit sufficient); In re Ramirez Rodriguez, 209 B.R. at 431 (expert

affidavit sufficient); In re Colonial Realty Co., 209 B.R. 819, 821-22 (Bankr. D.

Conn. 1997) (expert affidavit sufficient); In re Taubman, 160 B.R. 964, 976-80

(Bankr. S.D. Ohio 1993) (expert affidavit sufficient); In re Int'l Loan Network,

Inc., 160 B.R. 1, 7-10 (Bankr. D.D.C. 1993) (expert affidavit and prior judicial

decisions sufficient).  Defendant nevertheless objects to the affidavit on several

grounds.  After carefully considering these objections, the Court is unpersuaded

that consideration of Mr. Kahlberg's testimony would be improper.

First, Defendant's argument that the affidavit is not made on Mr.

Kahlberg's "personal knowledge" is without merit.  Personal knowledge, as

innumerable decisions from the federal courts make clear, can be gleaned from a review of records pertinent to a given case.  See, e.g., Schwimmer v. Kaladjian, 988 F. Supp. 631, 642 (S.D.N.Y. 1997) (doctor's affidavit, based on review of patient's medical records, was "sufficient to meet the personal knowledge requirement of Rule 56(e)"); see also Baker v. Veneman, 256 F. Supp. 2d 999, 1005 (E.D. Mo. 2003) ("It appears to the Court that Mr. Arnold based his Declaration upon his review of the loan files and his experience as a Farm Loan Manager.  His statements are therefore based upon his personal knowledge and are not inadmissible hearsay.  The Court does not believe the statements in Mr. Arnold's Declaration are improper under Rule 56(e), and for these reasons, the Court will deny the Motion to Strike."); Beaver v. Howard Miller Clock Co., 852 F. Supp. 631, 634 (W.D. Mich. 1994) (expert affidavit sufficient when stated that opinions based on review of materials generated by discovery); Washington Cent. R.R. Co. v. Nat'l Mediation Bd., 830 F. Supp. 1343, 1353 (E.D. Wash. 1993) ("Based on personal knowledge of the files and records, a declarant may testify to acts that she or he did not personally observe but which are described in the record, including requests or statements by third persons made to someone other than the declarant."); Vote v. United States, 753 F.

31

Supp. 866, 868 (D. Nev. 1990) (IRS agent's affidavit "complie[d] with Rule 56(e) in that it [was] based upon her personal familiarity with plaintiff's case and her review of plaintiff's file").

Further, the Court perceives no failing in the materials and statements upon which Mr. Kahlberg relied. Initially, there can be no dispute (and, certainly, Defendant has offered nothing to create one) that the information upon which Mr. Kahlberg purports to base his conclusion is of the type reasonably relied on by professionals in his field. See, e.g., Int'l Adhesive Coating Co. v Bolton Emerson Int'l, Inc., 851 F.2d 540, 545 (1st Cir. 1988) (accountant reasonably relied upon financial records and interviews with employees to determine solvency of corporation); In re Colonial Realty Co., 209 B.R. at 821-22 (financial records and interviews with employees were reasonably relied on by accountant in determining whether business operated as Ponzi scheme and was insolvent); In re Taubman, 160 B.R. at 964 (expert reasonably relied on statements by employees in concluding enterprise operated as Ponzi scheme and was insolvent); In re Int'l Loan Network, Inc., 160 B.R. at 6 (accountant reasonably relied on financial records, interviews with employees, and testimony of agents in ascertaining whether business operated as Ponzi scheme). What is

AO 72A
(Rev.8/82)

more, the fact that his conclusion was predicated in part on "hearsay" poses no

obstacle to the Court's consideration of his conclusion.  See, e.g., In re

Taubman, 160 B.R. at 976-77 ("Therefore, as long as . . . facts or data are of

the type reasonably relied upon by experts, they may include hearsay or other

inadmissible evidence.").

        In light of the foregoing, moreover, the Court declines Defendant's

invitation to strike Mr. Kahlberg's testimony because, at the conclusion of the

affidavit, he states that, "The statements contained in this affidavit are true and

accurate to the best of my information, knowledge, and belief."  (See First

Kahlberg Aff. ¶ 78.)  To be sure, a witness who avers a particular fact based on

no more than their "information and belief" fails to assist a litigant in either

securing or avoiding summary judgment.  See Pace v. Capobianco, 283 F.3d

1275, 1278-79 (11th Cir. 2002) (reiterating that information and belief is not

equivalent to personal knowledge).  Indeed, if, for example, the pertinent portion

of Mr. Kahlberg's affidavit instead read, "It is my belief that new investor

money was used to pay returns to old investors in the Cash 4 Titles scheme and

was therefore a Ponzi Scheme[,]" the Court would be constrained to disregard

33

his statement.  <u>Pace</u>, 283 F.3d at 1278-79.  But his affidavit does not say that.

Rather, it provides:

> It is my conclusion that new investor money was used
> to pay returns to old investors in the Cash 4 Titles
> scheme and was therefore a Ponzi Scheme.  *This
> conclusion is based on the following*:
>
> > 1. The admissions of Gause and Homa that
> >    Cash 4 Titles was a Ponzi Scheme;
> >
> > 2. My review of the Cash 4 Titles records in
> >    the Cayman Islands identified new investor
> >    money was used to pay returns to old
> >    investors; and
> >
> > 3. A comparison of the interest paid to
> >    investors from Cash 4 Titles as compared to
> >    the combined net income earned by all the
> >    Cash 4 Titles stores.

<u>See</u> First Kahlberg Aff. ¶ 76 (emphasis supplied).  The concluding language of

his affidavit, which alludes to "information" and "belief," while perhaps

unfortunate, does not require the Court to disregard this testimony–the

foundation of Mr. Kahlberg's personal knowledge respecting the nature of the

C4T enterprise is more than clear.

Likewise, Mr. Kahlberg's failure to attach to his affidavit the myriad

volumes of documents he relied upon in familiarizing himself with the C4T

AO 72A
(Rev.8/82)

scheme does not persuade the Court that striking his testimony would be proper.  Defendant has not alleged that it was precluded from obtaining and reviewing such documentation during discovery,[9] or otherwise demonstrated any prejudice from the omission.  Cf. In re Lake Country Invs., 255 B.R. at 596 (stating that expert could review materials not before the court in opining as to existence of Ponzi scheme, and noting that aggrieved litigant should seek to remedy inadequate disclosures through Rule 56(f) motion).  The argument that failure to attach such documents renders an affidavit inherently infirm and unworthy of consideration has found little favor with the courts where, as here, the "refer[enced]" papers are voluminous and complex accounting records, and are cited only as the basis for an expert's acquisition of personal knowledge, rather than offered (in unauthenticated form) for independent consideration by the court.  See, e.g., id.; In re Colonial Realty Co., 209 B.R. at 822 (rejecting argument that court could not consider uncontradicted expert affidavit over objection that the affidavit was "based on hearsay and documentary evidence

---

[9] Notably, in his Response to Defendant's Motion for Leave to File Third-Party Complaint, Plaintiff, through counsel, represents that he produced to Defendant well over 6,000 pages of documents, filling ten 4" binders.  (See Pl.'s Resp. in Opp'n to Def.'s Mot. for Leave to File Third-Party Compl. [112] at 2.)

that the defendant has had no opportunity to review"); cf. also In re Int'l Loan Network, Inc., 160 B.R. at 6 (considering expert affidavit where materials upon which he relied were not in the record, but rather, were of the type represented in "sample" provided to the court); FED. R. EVID. 1006 ("The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.  The court *may* order that they be produced in court.") (emphasis supplied).

In sum, while perhaps not the paragon of Rule 56(e)'s form requirements, Mr. Kahlberg's affidavit is sufficient to provide *some* evidence that the C4T Entities and the Receivership Subjects were participants in a Ponzi scheme, and were insolvent as a matter of law.  Standing unrebutted, the Court perceives no reason to cast aside such testimony in its consideration of the parties' cross-motions for summary judgment.

(b)     The Gause plea

Even putting the Kahlberg affidavit aside, the Court finds the transcript of Mr. Gause's guilty plea (not to mention those of his compatriots) sufficient to

36

establish the nature of the C4T enterprise as a Ponzi scheme.  The record before the Court shows that, on March 2, 2001, Mr. Gause was called before Judge John G. Koeltl of the United States District Court for the Southern District of New York, took an oath, and pled guilty to charges of, *inter alia*, securities fraud and money laundering.  (See Pl.'s Mot. for Summ. J. [67] Ex. I, at pp. 1, 4, 9-19, 40-41.)  The transcript was certified as a true and correct copy by the deputy clerk on October 1, 2003.  (See id. at 43.)  In the course of tendering his plea, Mr. Gause represented to the court:  (i) that he solicited money for the Cash 4 Titles enterprise, informing prospective investors that they would receive impressive rates of return, (id. at 28); (ii) that he "caused money received from the settled securities to [be used to] make interest payments due on the existing securities from the people, and . . . knew that the investors were not told everything about the company at that time[,]" (id. at 29-30); (iii) that he "did not tell [investors] at that time their monies would be used to go into Cash 4 Titles, and in essence, [that he] used new money to pay off old investors[,]" (id. at 30); and (iv) that the "monies [received from investors] never got to the company[,] . . . [but] were used to pay off older investors." (Id.)  Such testimony paints the picture of a textbook Ponzi scheme, see In re Fin. Federated Title & Trust, 309

37

F.3d at 1327 n.2, and Defendant's argument that it should be ignored by the Court in ascertaining whether the C4T Entities operated such a scheme is unpersuasive.  See, e.g., Beiswenger Enters. Corp. v. Carletta, 46 F. Supp.2d 1297, 1299 (M.D. Fla. 1999) ("Trial testimony, even when from a proceeding in which the parties, subject matter, and counsel are not the same can be used because it is sworn testimony which is at least as reliable as that found in affidavits."); accord Williams v. Vasquez, 62 Fed. Appx. 686, 692 (7th Cir. 2003) (collecting cases, held, "along with other courts, we have recognized that transcripts of testimony may be considered in support of, or opposition to, a motion for summary judgment").

Simply stated, the evidence before the Court amply demonstrates what numerous other courts have recognized, and what Defendant has not even attempted to contradict: the C4T Entities were embroiled in a massive Ponzi scheme, and were necessarily insolvent.  See Wolff v. Cash 4 Titles, 351 F.3d 1348, 1350 (11th Cir. 2003) (describing Cash 4 Titles as "a Ponzi scheme [that] involved the sale of securities of corporations formed for the purpose of making high-interest loans to members of the public, who would pledge their automobile titles as collateral"); SEC v. Homa, 17 Fed. Appx. 441, 443-44 (7th Cir. 2001)

(describing nature of C4T Ponzi scheme); <u>Stenger</u>, 2006 WL 449151, at *1

(discussing C4T Ponzi scheme in suit brought by Plaintiff against Homa's ex-

wife for fraudulent conveyance under Georgia law); <u>SEC v. Homa</u>, No. 99 C

6895, 2004 WL 1093492, at *1 (N.D. Ill. May 13, 2004) ("From at least 1995

through October 1999, until he was arrested by the FBI, prosecuted criminally

by the United States Attorney's Office, and civilly sued by the Securities and

Exchange Commission ('SEC'), Charles Richard Homa ('Homa'), with the

assistance of Michael E. Gause ('Gause'), developed and operated one of the

largest Ponzi schemes in United States history, using a variety of businesses

supposedly associated with an automobile title lending business called 'Cash 4

Titles' or 'C4T.' "); <u>SEC v. Homa</u>, No. 99 C 6895, 2004 WL 725256, at *1

(N.D. Ill. March 31, 2004) ("The Securities and Exchange Commission ('SEC')

brought this action against Charles Richard Homa and other defendants as a

result of their involvement in one of the largest Ponzi schemes in U.S. history.");

<u>Stenger v. Leadenhall Bank & Trust Co.</u>, No. 02 C 8655, 2004 WL 609795, at

*2 (N.D. Ill. Mar. 23, 2004) ("Homa, Gause, and Denson created a complicated

maze of Cayman Islands and Bahamian companies and corresponding

Leadenhall bank accounts, including Morningstar, to be used in receiving

AO 72A
(Rev.8/82)

investor funds and facilitating inter-bank transfers to assist Gause, Homa, and

downline marketers in avoiding the scrutiny of United States regulators while at

the same assisting in the perpetuation of a [C4T] Ponzi scheme."); Stenger v.

World Harvest Church, Inc., No. 02 C 8036, 2003 WL 22048047, at *1 (N.D.

Ill. Aug. 29, 2003) ("Between 1996 and October 1999, Homa, Gause and

Pearson ('the Receivership Subjects') engaged in an elaborate scheme,

fraudulently inducing investors to purchase interests in an enterprise called Cash

4 Titles ('C4T') whose ostensible purpose was to provide capital to consumer

lending companies.  The enterprise was not profitable, and as in the classic

'Ponzi' scheme, the contributions of later investors were used to pay off earlier

investors.  The Receivership Subjects also diverted significant amounts of the

investors' funds for their personal use and for the benefit of their friends and

associates.  All told, they defrauded some 2,400 investors out of an excess of

$200 million.").  Defendant's argument to the contrary lacks merit.

(ii)    <u>Intermediaries' receipt of funds does not<br>undermine claim</u>

Defendant next argues that Plaintiff's fraudulent conveyance claim cannot

succeed because there is no evidence that Mr. Gause and the Gause Affiliated

40

Entities which directly made contributions to Defendant were insolvent.  The Court is unpersuaded.

The use of intermediaries to transfer funds from a Ponzi scheme to a defendant-recipient does not undermine the viability of a fraudulent conveyance claim.  See, e.g., Scholes, 56 F.3d at 754 ("In the case of the ex-wife, the money went from the corporations first to Douglas and then from him to her, but we cannot see what difference that should make . . . .").  In this case, moreover, the record does not reveal any source of income attributable to the Gause family or their affiliated entities during the relevant time period other than that associated with the C4T Ponzi scheme.  (See Pl.'s Mot. for Summ. J. [67], Ex. Y, at 8-10, 17-18, 68; Second Kahlberg Aff. ¶¶ 56-58, 61.)  In the absence of any showing that the contributions at issue arose from some source other than the insolvent C4T Entities, the label of insolvency necessarily attaches to the intermediate recipients/transferors as well.  See Stenger, 2006 WL 449151, at *7 (applying O.C.G.A. §18-2-22(3) to case involving C4T Entities and Mr. Homa, relied on principle that "a Ponzi scheme is insolvent from day one" to conclude that Mr. Homa was himself insolvent at time of challenged transfers).

What is more, even if the Court were to assume (i) that the fraudulent transfer statute required a showing of fraud *vis-a-vis* each "link" in the conveyance from an entity to a defendant-recipient, and (ii) that subsection (3) of the statute was inapplicable to transfers made directly to Mr. Gause, because he provided some "valuable consideration" to the C4T Entities in the form of legitimate services, the record would continue to sustain Plaintiff's claim.  That initial transfer of funds from the C4T Entities to Mr. Gause was itself fraudulent under subsection (2) of the statute, which deems unlawful "[e]very conveyance of . . . personal estate . . . made with intention to delay or defraud creditors, where such intention is known to the taking party[.]"  O.C.G.A. § 18-2(2) (repealed 2002).  The C4T Entities' intention to defraud creditors can be inferred from the mere fact that they were operating as a Ponzi scheme.  Cf., e.g., In re Mark Benskin & Co., 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993) (applying 11 U.S.C. § 548, observed, "[T]he statutory language makes it plain that one can infer an intent to defraud from the mere fact that Debtors were operating a Ponzi scheme.") (internal quotations and citations omitted); In re Indep. Clearing House Co., 77 B.R. at 860-61 ("Although the question of the debtors' intent would ordinarily present a factual question, we conclude that,

from the undisputed evidence in the record, only one inference is possible–namely, that the debtors had the intent to hinder, delay or defraud creditors.  The trustee's undisputed evidence is that the debtors were engaged in a Ponzi scheme and therefore must have known that undertakers at the end of the line would lose their money.  That is the only evidence there is.  We conclude that it was sufficient to establish, as a matter of law, the debtors' actual intent to hinder, delay or defraud creditors within the meaning of section 548(a)(1).").  Mr. Gause, moreover, admitted that the C4T Entities were engaged in a Ponzi scheme, and, consequently, that intention is attributable to him as well.  (See Pl.'s Mot. for Summ. J. [67] Ex. I, at pp. 28-30.)

In light of the foregoing, the Court finds it all but inconsequential that the C4T Entities' funds found their way into the coffers of Defendant only through the filter of Mr. Gause and entities affiliated with him.  That additional layer of financial maneuvering does not pose an obstacle to Plaintiff's success here.

     b. <u>The transfers were not for "valuable consideration"</u>

The record likewise supports the conclusion that the transfers were not made for "valuable consideration" within the meaning of O.C.G.A. § 18-2-22(3).  Defendant took the tainted funds as tithes and offerings, in the nature of

charitable contributions.  See United States v. Am. Bar Endowment, 477 U.S.

105, 118, 106 S. Ct. 2426, 91 L. Ed. 2d 89 (1986) ("The *sine qua non* of a

charitable contribution is a transfer of money or property without adequate

consideration."); Scholes, 56 F.3d at 759 (discussing allegedly fraudulent

conveyances to religious organizations, stated: "If one thing is clear, it is that a

gift to a charity (to anyone, for the matter) is not in exchange for full in the sense

of commensurate consideration.  Otherwise it would not be a gift, but an

exchange.").

Defendant, plainly, engaged in no valuable exchange with the C4T Entities

or the Gause Affiliated Entities that facilitated the contributions.  Those actors,

which the law perceives as distinct from Mr. Gause, derived no benefit from the

Church.

Furthermore, even respecting Mr. Gause and his wife, the benefits

Defendant purports to have bestowed on its parishioners in connection with the

contributions are not cognizable as "valuable consideration" under the law.  See

O.C.G.A. § 18-2-22(3) (repealed 2002) (defining concept of fraudulent

conveyance in terms of absence of "valuable consideration"); O.C.G.A. § 13-3-

41 ("Considerations are distinguished into 'good' and 'valuable.'  A good

44

consideration is such as is founded on natural duty and affection or on a strong

moral obligation.  A valuable consideration is founded on money or something

convertible into money or having a value in money, except marriage, which is a

valuable consideration."); United States v. Reid, 127 F. Supp. 2d 1361, 1368-69

(S.D. Ga. 2000) (in Georgia, transfer lacks valuable consideration if is "not

founded on money, or something convertible into money, or having a value in

money[,]" including, *e.g.*, "love and affection") (internal quotations omitted).

Indeed, when pressed to define the consideration the Church gave to the Gauses

in exchange for their contributions, Pastor Hufton himself did not purport to

identify any reciprocal benefit having monetary value, but rather, candidly

explained that the "benefit" inuring to the Gauses "is not tangible in the kingdom

of the world but it's tangible to God."  See Hufton Dep. [85].[10]  Any tangible

---

[10] The Court, to be sure, does not diminish in any way the intangible "value" a donor
receives in making contributions to a house of worship.  The fraudulent conveyance statute,
however, speaks in terms of "valuable consideration"–a legal concept that does not
embrace purely spiritual benefits.  To the extent Defendant relies on In re Moses, 59 B.R.
815 (N.D. Ga. 1986) (holding that $4,700 in contributions made to church were "property"
and of "reasonably equivalent value," sufficient to defeat claim under 11 U.S.C. § 548,
where debtors received 80 to 100 hours of counseling and attended at least three religious
services a week, and offerings were used to pay operating expenses of church), to support
a different result, the Court finds the decision factually distinguishable, and, ultimately,
unpersuasive in the context of a fraudulent conveyance challenge made pursuant to
O.C.G.A. § 18-2-22.

benefits accepted by the Gauses in connection with their membership in the Church, moreover, such as counseling, worship services, literature, and communal meals, do not appear to have been "bargained for" exchanges *vis-a-vis* the contributions made to Defendant, but instead were benefits bestowed by the Church on all its members.  <u>See</u> O.C.G.A. § 13-3-42 (consideration contemplates bargained for exchange); Hufton Aff. [79] at ¶ 5 ("World Harvest expends all tithes, charitable donations and gifts in the operation of the church, including providing for worship services, religious instruction, spiritual counseling, recreational programs and facilities, transportation, speakers, books and literature, communal meals, facilities, utilities, electronic and audio-visual equipment, liability insurance support of missions and construction and maintenance of its church facilities.").  Simply put, the Gauses, while perhaps deriving some spiritual benefit for their contributions, did not receive anything Georgia law recognizes as "valuable consideration" within the meaning of the fraudulent conveyance statute.

In summary, Plaintiff has demonstrated that the conveyances made to Defendant originated, and were facilitated, by insolvent persons and entities, and were not made for "valuable consideration."  No genuine issue of fact exists,

and Plaintiff is entitled to summary judgment on his fraudulent conveyance claim as a matter of law.

## II.       Defendant's Motion to Strike

Defendant has moved to strike the affidavits submitted in support of Plaintiff's Motion for Summary Judgment, at least insofar as those affidavits reflect testimony that the C4T Entities operated as a Ponzi scheme.  Because the Court has already rejected Defendant's argument *vis-a-vis* the First Kahlberg Affidavit, and because, even without the challenged affidavits, the record adequately supports the conclusion that the Entities and the Receivership Subjects were engaged in such a scheme, the Court need not consider the matter further.  Defendant's Motion to Strike and Objection to Affidavits [82] is **DENIED**.

## III.      Defendant's Motion for Leave to File Third-Party Complaint

The final motion pending before the Court is Defendant's Motion for Leave to File Third-Party Complaint [110].  In that motion, Defendant asks the Court to permit it to file third-party claims against GuideOne Mutual Insurance Company ("GuideOne") for breach of contract, bad faith, and stubborn

47

litigiousness.  It claims that GuideOne provided it with commercial general liability insurance during all times relevant to this lawsuit, and that GuideOne undertook the defense of this matter (and provided substantial legal assistance over the course of eleven months) without a reservation of rights.  Defendant states that, notwithstanding this undertaking, GuideOne recently informed it that the insurance company would neither indemnify nor continue to defend it in this action, and abandoned the defense of this matter in February of 2005.  It is Defendant's position that GuideOne, due to its defense of the action without the reservation of rights, is estopped from denying coverage, and that the insurance company is consequently liable to Defendant under the aforementioned theories of relief.

"The grant of leave to file a complaint in impleader is within the sound discretion of [the] court."   Greene Line Mfg. Corp. v. Fibreboard Corp., 130 F.R.D. 397, 399 (N.D. Ind. 1990).

> In determining the propriety of an impleader request, this court must look at whether the plaintiff or potential third-party defendant will suffer prejudice, whether the impleaded claim will complicate matters at the time of trial, whether the third-party claim has merit and whether granting leave to implead will impose significant additional costs on the parties.

Id.  After considering the matter, the Court declines to exercise its discretion in favor of permitting Defendant's third-party claims to proceed here.

Succinctly stated, this matter has been proceeding, in one forum or another, for almost four years.  Discovery has concluded, the parties have cross-moved for summary judgment, and, by virtue of this Order, Plaintiff's claims (or at least, the substantial bulk of them) have been resolved.  The Court struggles to see how allowing Defendant to assert third-party claims now would serve judicial economy or efficiency.

Defendant insists that discovery and resolution of its claims *vis-a-vis* GuideOne could proceed expeditiously, as its success on the proposed third-party claims is all but a foregone conclusion.  That may be the case.  It if is, then Defendant is of course free to initiate a separate action, and move for judgment on the pleadings or summary judgment promptly after the commencement of litigation.  See Fed. R. Civ. P. 12(c) & 56(a).  It may be, however, that GuideOne intends to put up a substantial defense to Defendant's claims–a defense that involves complex factual issues.  Without having heard from GuideOne, the Court is in no position to make an informed judgment on the issue, but, in any event, does not believe Plaintiff should be forced to bear

49

the risk of having resolution of this already protracted litigation further delayed.

Defendant's Motion for Leave to File Third-Party Complaint [110] is **DENIED**.


### Conclusion

Defendant's Motion for Leave to File Third-Party Complaint [110]

appears twice on the docket.  The Clerk is **DIRECTED** to remove the second

entry [111] from the pending motions list.

Defendant's Motion to Strike and Objection to Affidavits [82] and

Motion for Leave to File Third-Party Complaint [110] are **DENIED**.  The

parties cross-motions for summary judgment [67, 78] are **GRANTED in part**

**and DENIED in part**.  Defendant is entitled to judgment as a matter of law on

Plaintiff's unjust enrichment claim, but Plaintiff is entitled to summary judgment

on his claim that Defendant received $1,808,400 in fraudulent transfers from Mr.

Gause and the Gause Affiliated Entities.

From the Court's review of the record, it appears that the only further

matters to be resolved in this controversy, apart from the issue of costs and fees

(which should be presented pursuant to the Local Rules of this Court), are as follows:

> (1) the disposition of Plaintiff's claims with respect to conveyances Mr. Pearson allegedly made, or caused to be made, to Defendant (the "Pearson Conveyances"); and

> (2) in the event Plaintiff elects not to proceed to trial on his claims involving the Pearson Conveyances, but instead chooses to either settle such claims or voluntarily dismiss them,

>> (a) what relief, other than or in lieu of a money judgment, Plaintiff is entitled to as a consequence of prevailing on his fraudulent conveyance claim, and

>> (b) to the extent Plaintiff seeks only the entry of a money judgment, the amount of any judgment to be entered against Defendant, inclusive of interest.

Plaintiff is **DIRECTED** to notify the Court and opposing counsel, by no later than ten (10) days after the date appearing on this Order, whether or not he intends to take Defendant to trial on the claims involving the Pearson Conveyances.  In the event he intends to do so, then the parties shall have thirty

51

(30) days after the date such notice is given to submit their LR 16.4, NDGa

proposed Consolidated Pretrial Order.  Conversely, in the event Plaintiff does

not intend to proceed to trial, Plaintiff is **DIRECTED** to make a written

submission respecting the matters identified in subparagraph (2) above by no

later than thirty (30) days after filing the requested notice.  Defendant shall then

have twenty (20) days within which to file any response.

      **SO ORDERED** this _ 31st _ day of March, 2006.


                          /s/ Richard W. Story
                          RICHARD W. STORY
                          UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)